IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| DORAREEN THOMPSON, ) | |
| ) | Case No. 4:09CV00013 |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | By: Jackson L. Kiser |
| ) | Senior United States District Judge |
| Defendant. ) | |

Before me is the Report and Recommendation ("R&R") of the United States Magistrate Judge recommending that I grant Plaintiff's Motion for Summary Judgment and remand the case to the Commissioner of Social Security ("Commissioner") for further proceedings. The Commissioner filed objections to the Magistrate's Report and Recommendation. I have reviewed the Magistrate Judge's recommendation, Defendant's objections, and relevant portions of the record. The matter is now ripe for decision. For the reasons stated below, I will **REJECT** the Magistrate's Report and Recommendation and **GRANT** the Defendant's Motion for Summary Judgment.

## I. STATEMENT OF FACTS AND PROCEDURAL HISTORY

In August 2001, while working as a caregiver, Dorareen Thompson ("Plaintiff") attempted to move a patient into a wheelchair and experienced pain in her lower back. (R. 41, 119, 200, 211.) Since that time, she has alleged chronic pain throughout her body, particularly in her neck, back, hips, buttocks, and legs. (R. 119, 128, 130, 136, 143, 576–77.) She has also received diagnoses for a myriad of conditions, including fibromyalgia, degenerative disc disease,

1

carpal tunnel syndrome, chronic fatigue, weakness, muscle spasms, sleep apnea, depression, rheumatoid arthritis, restless legs, panic attacks, anxiety attacks, headaches, memory loss, and crying spells. (R. 119, 137, 143, 576–77, 579, 601, 606–07.) According to Plaintiff, the prescription medications she uses to deal with these ailments cause her additional difficulty in standing, walking, sitting, using her hands, and staying awake.

On July 5, 2002, Plaintiff filed an application for disability insurance benefits and supplemental security income under the Social Security Act ("Act") (42 U.S.C. §§ 401-433, 1381-1383f) alleging disability beginning December 14, 2001. (R. 100–02.) The claims were denied at the initial level and upon reconsideration. (R. 51–53, 58–60.) At Plaintiff's request, a hearing was held before an Administrative Law Judge ("ALJ") on September 17, 2003. (R. 569–91.) The ALJ enlisted the aid of a Vocational Expert ("VE") at the hearing. (R. 572, 589–90.) On November 25, 2003, the ALJ issued a decision finding that Plaintiff was not disabled because she was able to perform her past relevant work. (R. 38–46.) On April 2, 2004, the Appeals Council remanded the case for further proceedings due to an apparent inconsistency in the ALJ's decision.[1] (R. 49–50.)

A second administrative hearing was held on October 13, 2004. (R. 592–617.) As before, the ALJ sought the assistance of a VE. (R. 595, 609–14.) On November 24, 2004, the ALJ again found that Plaintiff was not disabled under the Act because, although she was unable to perform her past relevant work, she retained the ability to perform a significant number of jobs in the national economy. (R. 22–30.) Plaintiff submitted additional evidence to the Appeals Council and requested a review of the ALJ's second decision, but the Appeals Council determined the evidence did not warrant additional review. (R. 9–17.) Plaintiff appealed that

---

[1] Although the ALJ found Plaintiff suffered from severe impairments, the ALJ also concluded that Plaintiff maintained the residual functional capacity to perform a full range of light work. (R. 40–45, 49.) The Appeals Council determined "[t]his inconsistency require[d] clarification." (R. 49.)

2

decision to this Court. See Thompson v. Commissioner of Social Security, No. 4:05CV00024. On December 19, 2005, United States Magistrate Judge B. Waugh Crigler issued an R&R recommending I remand the case for further proceedings in light of the new evidence Plaintiff presented to the Appeals Council. (R. 889–97.) Neither party objected to the R&R, and I adopted it in its entirety and remanded the case for further proceedings on January 6, 2006. (R. 887–88.)

A third administrative hearing was conducted on July 26, 2006. (R. 906–44.) Although a VE was present during the hearing, the ALJ determined that further VE testimony was unnecessary. (R. 625–26, 908.) On November 16, 2006, the ALJ issued a decision concluding that Plaintiff was not disabled because she was able to perform her past relevant work. (R. 625–42.) In the alternative, the ALJ found that, even if Plaintiff's limitations precluded her from performing her past relevant work, Plaintiff could still perform a significant number of sedentary jobs existing in the national economy. (R. 641.) Plaintiff attempted to appeal the ALJ's decision with the Appeals Council, but the effort was untimely, so the ALJ's opinion stood as the final decision of the Commissioner.[2] (R. 618-20.)

Plaintiff again appealed to this Court. On January 5, 2010, Magistrate Judge Crigler recommended that I grant Plaintiff's Motion for Summary Judgment and remand the case to the Commissioner for further proceedings at the final level of the sequential evaluation. (R&R 1, 5–7.) The Magistrate Judge reasoned that the opinions of Dr. Haney, Dr. Bodeur, Dr. Shchelchkov, and Dr. Teresa Moore supported Plaintiff's claim, while Dr. Garrett—a non-treating, non-

---

[2] Where a social security applicant's filing with the Appeals Council is untimely, the district court is normally without jurisdiction to consider the matter, as the Appeals Council's time-based dismissal does not constitute a final decision by the Commissioner as required under 42 U.S.C. § 405(g). See Adams v. Heckler, 799 F.2d 131, 133 (4th Cir. 1986). In an instance such as the one presented by the immediate case, however, where the matter has been remanded to the ALJ by a district court, the ALJ's decision constitutes the final decision of the Commissioner. See 20 C.F.R. § 404.984(a), (d). Therefore, regardless of whether the Appeals Council reviewed the ALJ's post-remand decision, the applicant retains the right to judicial review on the merits. See Hewitt v. Barnhart, No. 5:01CV00040, 2002 U.S. Dist. LEXIS 17351, at *10–11 (W.D. Va. Sept. 13, 2002); 20 C.F.R. § 404.984(a), (d).

3

examining physician—provided the sole evidentiary basis for the ALJ's unfavorable decision. (Id. at 4–6.) Accordingly, Magistrate Judge Crigler concluded the ALJ's determination was not supported by substantial evidence. (Id. at 6.) The Commissioner filed an objection to the R&R on January 15, 2010.

## II. STANDARD OF REVIEW

Congress has limited judicial review of decisions by the Social Security Commissioner. I am required to uphold the decision where: (1) the Commissioner's factual findings are supported by substantial evidence; and (2) the Commissioner applied the proper legal standard. 42 U.S.C. § 405(g); see also Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). The Fourth Circuit has long defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). In other words, the substantial evidence standard is satisfied by producing more than a scintilla but less than a preponderance of the evidence. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The Commissioner is charged with evaluating the medical evidence and assessing symptoms, signs, and findings to determine the functional capacity of the claimant. 20 C.F.R. §§ 404.1527–404.1545. The regulations grant the Commissioner latitude in resolving factual inconsistencies that may arise during the evaluation of the evidence. 20 C.F.R. §§ 404.1527, 416.927. If the ALJ's resolution of conflicts in the evidence is supported by substantial evidence, then I must affirm the Commissioner's final decision. Laws, 368 F.2d at 642.

## III. DISCUSSION

In her Motion for Summary Judgment, Plaintiff argues the ALJ disregarded the opinions

of her treating physicians, particularly Dr. Brodeur, Dr. Haney, and Dr. Teresa Moore. In doing so, Plaintiff asserts the ALJ erroneously failed to include all of Plaintiff's limitations in the residual functional capacity ("RFC") evaluation.[3] Plaintiff also argues that all of the new evidence submitted after the second administrative hearing established that her condition had deteriorated since that time. Therefore, according to Plaintiff, the ALJ at the third hearing could not have rationally found Plaintiff's RFC to be greater than that established by the ALJ at the second hearing.[4] Although Magistrate Judge Crigler was persuaded by these arguments, I am not. Considering the record as a whole, the evidence supporting the ALJ's RFC assessment and ultimate decision is not merely substantial—it is overwhelming.

Starting with the evidence of the treatments and evaluations Plaintiff received for her physical impairments, it is clear the ALJ had adequate evidentiary support for his determination. In January 2002, after six visits, Plaintiff's chiropractor gave her an excellent prognosis and found a 100% improvement. In February 2002, Dr. Robert Wade with Progressive Therapy examined Plaintiff and determined her cervical and passive ranges of motion were within normal limits. Plaintiff had arm strength of 5/5 bilaterally,[5] and her x-rays were negative. In April

---

[3] The ALJ determined Plaintiff has the following RFC:

> [T]he claimant has the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently, to stand and walk at least 6 hours in an 8-hour day, to sit about 6 hours in an 8-hour day, and she has mental limitations of function. She is slightly limited in her capacities to [(1)] understand and remember short, simple instructions, (2) carry out short, simple instructions, (3) understand and remember detailed instructions, (4) carry out detailed instructions, and (5) make judgments on simple work-related decisions.

(R. 628.) Because of this, the ALJ found Plaintiff is capable of performing her past relevant work as a sewing machine operator and housekeeper/companion. (R. 641.) In the alternative, the ALJ determined that, even if Plaintiff's mental limitations were found to preclude her performance of those occupations, she would still be capable of performing sedentary jobs as identified by the VE at the second administrative hearing. (Id.)

[4] Judge Thomas R. King presided over Plaintiff's first and second administrative hearings. (R. 569–91, 592–617.) Judge Thomas Mancuso presided over the third. (R. 906–44.)
[5] A score of 5/5 indicates normal muscle strength.

5

2002, Dr. Robert W. Sydnor, an orthopedic surgeon, examined Plaintiff and found her lateral bend, rotation, forward flexion, and extensions were full with no significant discomfort.  He also determined Plaintiff had full lateral bend and rotation in the lumbar spine and a full range of motion in the hips without crepitation, grating, or pain.  Dr. Sydnor noted Plaintiff's strength was within normal limits in her grip, biceps, triceps, deltoid, extensor hallucis, tibialis anterior, and gastroc soleus.  He concluded Plaintiff should limit herself to lifting no more than twenty-five pounds and avoid repetitive bending or stooping.

After undergoing a sleep study at Southside Community Hospital in May 2002, doctors determined Plaintiff's sleep apnea could be controlled through use of a Continuous Positive Airway Pressure ("CPAP") device.

In September 2002, Dr. Robert R. Johnson and Dr. Tammy Moore of the CRMH Rheumatology Clinic examined Plaintiff and determined she had 5/5 muscle strength in her deltoids, biceps, triceps, quadriceps, hamstrings, and hip flexors.  They did not find any swelling.  The doctors concluded Plaintiff had a normal range of motion in the hands, wrists, elbows, shoulders, hips, knees, toes, and feet.  In October 2002, Dr. Alston W. Blount, Jr. performed a consultative physical RFC form without examining Plaintiff.  Dr. Blount concluded Plaintiff could carry twenty pounds occasionally and ten pounds frequently and could stand for six hours and sit for six hours in an eight-hour workday.  In May 2003, Dr. Karen Steidle of Sheltering Arms Hospital examined Plaintiff and found that, although Plaintiff had mild degenerative disc disease, she had no significant canal or foraminal stenosis.  Plaintiff's motor tests revealed 5/5 strength in the upper extremities in grip, wrist extension, wrist flexion, pronation, supination, biceps, triceps, deltoid, and external rotation to the shoulders bilaterally.  An x-ray revealed signs of cervical spondylosis and degenerative disc disease but only very mild thoracic spondylosis.  In

September 2003, Dr. Haddon C. Alexander III, the impartial Medical Examiner ("ME") at Plaintiff's first administrative hearing, studied all of the medical opinions on record at the time and found no objective interference to Plaintiff's ability to perform light work.

In March 2004, Plaintiff underwent an MRI which showed her bone marrow signal intensity was within normal limits. The MRI also showed no spinal canal or neuroforaminal stenosis. A July 2004 MRI confirmed that Plaintiff did not suffer from spinal canal or neuroforaminal stenosis. In September 2004, Dr. Steven M. Fiore, an orthopedic surgeon, examined Plaintiff and found she was able to move about the room without any sign of significant pain, had a near full range of motion in her hips and back, and had negative straight leg raise tests. Dr. Fiore determined Plaintiff's upper and lower extremities were neurologically intact.

In October 2004, Dr. Teresa A.F. Moore, from whom Plaintiff had received treatment since early 2002, performed an RFC assessment on Plaintiff. Dr. Moore concluded Plaintiff could sit for a continuous thirty minutes and for six hours overall in a regular eight-hour workday and could stand for a continuous fifteen minutes but less than two hours in an eight-hour workday. Additionally, Dr. Moore found plaintiff was capable of lifting twenty pounds occasionally. In May 2005, Plaintiff made several visits to the University of Virginia Neurology Clinic, where examinations showed negative straight leg raise tests, no muscle spasms or abnormalities in places claimed to be trigger points, normal muscle tone and bulk, strong and symmetrical grip, 5/5 strength throughout Plaintiff's body, and brisk and symmetric reflexes. The doctors concluded there was no evidence of peripheral neuropathy or other neurological pathology. Tests conducted at a later visit that month showed Plaintiff did not have rheumatoid arthritis. Plaintiff returned to the University of Virginia Neurology Clinic in July 2005, and

doctors found normal tone and bulk in Plaintiff's muscles, 5/5 strength throughout Plaintiff's body, brisk and symmetric reflexes, and no evidence of radiculopathy.[6] Another visit showed Plaintiff had a normal cervical range of motion, no palpable trigger points in her lower back, and motor strength of 5/5 bilaterally. Based on lab tests, the doctors concluded Plaintiff's prior diagnoses of rheumatoid arthritis and degenerative joint disease were unfounded.

Plaintiff sought treatment with Dr. Evgenty Shchelchkov from October 2005 through May 2006. In October 2005, Dr. Shchelchkov found Plaintiff had 5/5 strength in all extremities, distally and proximately. Her gait was normal, she was able to walk on her heels and toes, and her stretch reflexes were equal and symmetrical. Dr. Shchelchkov summarized Plaintiff's physical examination as being within normal limits. At a later visit that month, Dr. Shchelchkov again noted Plaintiff's strength was 5/5 in all extremities and determined she only suffered from mild degenerative joint disease. In January 2006, Dr. Shchelchkov confirmed Plaintiff's muscles maintained normal tone and bulk and found Plaintiff had strength of 5/5 in all her extremities. By a January 2006 letter, Dr. Shchelchkov opined that Plaintiff would be capable of performing office work in a fixed environment and climate with a limited amount of physical activity. Dr. Shchelchkov noted Plaintiff should be able to carry ten pounds of weight at a time and five pounds or less repetitively. He also mentioned that Plaintiff's headaches would begin improving in severity and frequency within two to three months. In February 2006, Dr. Shchelchkov ordered an MRI of Plaintiff, and the results showed no significant spinal canal stenosis. At that time, Dr. Shchelchkov examined Plaintiff and found her strength was 5/5 in all extremities. Plaintiff appeared agile, and her gait was normal. Dr. Shchelchkov noted that Plaintiff was clinically improving. In March and April of 2006, Dr. Shchelchkov again confirmed Plaintiff's

---

[6] Radiculopathy is a nerve root dysfunction along the spine that can cause pain, weakness, numbness, and difficulty controlling muscles.

strength was 5/5. Also in April, the doctor found Plaintiff had a full range of motion of the neck and lower girdle, did not have any significant disc bulging or spinal canal stenosis, and moved without any significant discomfort when distracted.

Plaintiff also sought treatment with Dr. Teresa Moore again in January 2006. Dr. Moore determined that Plaintiff should be able to lift ten pounds or less occasionally, but she should limit her lifting to a maximum of twenty pounds. Dr. Moore found Plaintiff could sit for fifteen minutes at a time and stand or walk for twenty minutes at a time, so she would need a work environment permitting her to shift positions frequently. Finally, Dr. Moore opined Plaintiff should start with four-hour shifts before working her way up. In May 2006, Dr. Moore examined Plaintiff and determined her fibromyalgia had improved. Of particular interest, Plaintiff noted that she felt ready to find a job.

In July 2006, Dr. Norman Garrett, the ME at Plaintiff's third administrative hearing, examined the record and concluded that, although Plaintiff's doctors diagnosed her with numerous conditions, there was no objective medical evidence supporting the diagnosis of any severe physical impairment. Specifically, Dr. Garrett found no objective evidence of radiculopathy and no trigger point study results to support a diagnosis of fibromyalgia. He also noted that Plaintiff's tests for rheumatoid arthritis were all negative. Dr. Garrett concluded that the objective evidence in the record did not support imposing any physical limitations on Plaintiff.[7]

Facing this mountain of evidence, Plaintiff maintains the ALJ failed to give adequate

---

[7] It is unclear why Magistrate Judge Criger recommended I remand the case to the Commission with a specific instruction forbidding the ALJ from relying on Dr. Garrett's testimony. (R&R 6.) To the contrary, in evaluating an applicant's RFC, the ALJ is under a duty to consider all relevant evidence on record. See Social Security Ruling 96-8p.

9

consideration to Plaintiff's treating physicians, particularly Dr. Brodeur,[8] Dr. Haney, and Dr. Teresa Moore. This argument is flawed for several reasons. First, although Dr. Moore found Plaintiff "totally and permanently disabled" and not able to work in January 2005, she also found Plaintiff capable of working in both October 2004 and January 2006, as described above. In fact, Dr. Moore's October 2004 RFC matches the ALJ's RFC determination in several regards, including the finding that Plaintiff could sit at least six hours in an eight-hour day and lift twenty pounds occasionally. Moreover, Dr. Moore's January 2005 statement of limitations is undercut by Plaintiff's own admission to Dr. Moore in May 2006 that she felt able to work. Second, Dr. Haney's December 2004 conclusion that Plaintiff was "permanently disabled" and "not ready to return to work" is not entitled to the weight Plaintiff and Magistrate Judge Crigler accorded it. The determination of whether a social security applicant retains the ability to work is a legal conclusion expressly reserved for the Commissioner, and any medical opinion encroaching upon that sphere of authority is not entitled to any special significance. See 20 C.F.R. §§ 404.1527(e)(1), (3); 416.927(e)(1), (3). Third, most of the evidence submitted by Dr. Shchelchkov, one of Plaintiff's most recently active treating physicians, supports the ALJ's ultimate conclusion that Plaintiff is not disabled. Although the details of the ALJ's RFC assessment differ in some minor regards from Dr. Shchelchkov's findings, it was the ALJ's job to weigh and resolve the factual inconsistencies created by the conflicting evidence of record, see 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), and the vast amount of evidence described above was sufficient to support the ALJ's resolution. For this same reason, Dr. Brodeur's opinion from early 2003 is insufficient to require reversal of the ALJ's decision.

      Plaintiff's second argument—that the ALJ at Plaintiff's third hearing could not have

---

[8] Dr. Brodeur's opinion appears to have been based on a single meeting with Plaintiff, not a lengthy course of treatment like Plaintiff had with Dr. Shchelchkov and Dr. Moore.

rationally found her RFC to be greater than that established by the ALJ at the second hearing—is equally unavailing because it is based on a faulty premise. Plaintiff maintains that all of the new evidence presented after the second hearing establishes that her condition has deteriorated since then. As described above, however, a substantial amount of evidence presented after the second hearing, including the University of Virginia Neurology Clinic findings, nearly all of Dr. Shchelchkov's records, and Plaintiff's own statement that she felt she was improving and ready to work, contradict Plaintiff's argument.

Finally, contrary to Magistrate Judge Crigler's remarks, the ALJ's determination that Plaintiff's mental limitations do not render her disabled is also supported by substantial evidence.[9] A mental health status evaluation conducted by the Crossroads Community Services Board in late 2002 found Plaintiff did not suffer from problems with thought content, thought organization, confusion, or judgment. The Board concluded Plaintiff possessed a fund of information within normal limits and an IQ estimated within the average range. Dr. Steve Saxby's January 2003 mental RFC found no significant limitation in Plaintiff's ability for social interaction and adaptation. Dr. Saxby further determined Plaintiff suffered no significant limitation in most categories concerning understanding, memory, sustained concentration, and persistence, and of those categories showing some limitation, the limitation was only moderate. In July 2004, Dr. Daniel Kessler performed a mental status examination. Dr. Kessler concluded Plaintiff's overall intellectual abilities were in the low average range. Although Dr. Kessler administered the Minnesota Multiphasic Personality Inventory (MMPI-2), Plaintiff's responses yielded a likelihood of exaggeration of symptoms, thereby invalidating the results. Dr. Kessler

---

[9] Because Plaintiff's Motion for Summary Judgment does not identify any error in the ALJ's mental capacity determination, I will not provide as exhaustive of an analysis of the mental capacity evidence. The issue is, nevertheless, worth mentioning because of the Magistrate Judge's brief and somewhat confusing remark that "the evidence [of] the non-treating, non-examining review physician . . . did not address the effects of any mental limitations which likely disable [P]laintiff from her past relevant work." (R&R 6.)

11

concluded Plaintiff is capable of performing simple and repetitive tasks, and workplace attendance should not present a significant problem. In July 2005, while undergoing treatment at the University of Virginia Neurology Clinic, Plaintiff denied experiencing anxiety or panic attacks. In May 2006, Plaintiff told Dr. Teresa Moore her depression had lifted. In August 2006, at the instruction of the ALJ from Plaintiff's third hearing, Plaintiff sought a psychological evaluation with Dr. Karen Russell. Despite Plaintiff's complaint of memory problems, Dr. Russell found Plaintiff was able to recall the names and dosing instructions for all of her many medications, as well as other remote and background information. Plaintiff functioned in the average range of adult intelligence and did not display any signs of confusion or difficulty in answering questions. Dr. Russell determined Plaintiff's behavior was inconsistent with her complaints of depression. Plaintiff again took an MMPI-2 exam, and, as before, the results yielded an invalid profile due to Plaintiff's "obvious[]" exaggeration of symptoms. Dr. Russell concluded Plaintiff had poor insight into her psychological functioning, was able to perform simple and repetitive tasks from a mental standpoint, was able to maintain regular workplace attendance, and could understand and follow instructions. This evidence is clearly sufficient to support the ALJ's mental health determination, and I therefore refuse to disturb it.

### IV. CONCLUSION

For the reasons stated above, I will **REJECT** the Magistrate Judge's Report and Recommendation and **SUSTAIN** the Defendant's objections. I will **GRANT** the Defendant's

Motion for Summary Judgment, and this case shall be **DISMISSED** from the active docket of this Court.

The Clerk is directed to send a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

Entered this 17th day of March, 2010.

s/Jackson L. Kiser  
Senior United States District Judge